[Cite as *State v. Birt*, 2023-Ohio-2913.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|                       |   |                          |
|-----------------------|---|--------------------------|
| STATE OF OHIO,        | : |                          |
| Appellee,             | : | CASE NO. CA2022-12-121   |
|                       | : | O P I N I O N            |
| - vs -                |   | 8/21/2023                |
|                       | : |                          |
| JERRY BIRT,           | : |                          |
| Appellant.            | : |                          |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2011-03-0417

Jerry Birt, pro se.

Michael T. Gmoser, Butler County Prosecuting Attorney, and John Heinkel, Assistant Prosecuting Attorney, for appellee.

**HENDRICKSON, J.**

{¶ 1}   Appellant, Jerry Birt, appeals from a decision of the Butler County Court of Common Pleas denying his postconviction application for DNA testing.  For the reasons discussed below, we affirm the trial court's decision.

{¶ 2}   In 2011, appellant was convicted by a jury of five counts of rape, one count of attempted rape, intimidation of a witness, and reckless operation.  A full summary of the

testimony and evidence presented at appellant's trial was set forth in our prior decision, *State v. Birt*, 12th Dist. Butler No. CA2012-02-031, 2013-Ohio-1379. Rather than repeat those facts in full, we limit our discussion to those facts necessary to the resolution of appellant's application for DNA testing.

{¶ 3} Appellant's rape and attempted rape convictions arose out of allegations that between 2005 and March 6, 2011, appellant sexually abused his biological daughter, T.G., who was about 8 or 9 when the abuse began. The abuse, which T.G. testified included vaginal and anal sex as well as forced fellatio, occurred over a period of years at multiple residences in Germantown, Ohio and Middletown, Ohio. The last incident of sexual abuse, which correlated to the rape charge set forth in Count 6 in the indictment, occurred on March 6, 2011. At trial, the following evidence was offered by T.G. and by M.M. about the March 6, 2011 incident:

> T.G. testified that on March 6, 2011, when she was 12 years old, her father told her to go to his bedroom. "[M]y dad came in there in the bedroom, and he told me to pull my pants down, so when I pulled my pants down, my dad pulled down his pants, and he stuck it in my vagina, and he kept doing it." T.G. indicated that at some point, [appellant] stopped to see if their houseguest, [M.M.], was still in the shower. When [appellant] returned to the bedroom, T.G. testified that [appellant] once again pulled his pants down to his knees and told her to "suck his penis." T.G. testified that [M.M.] pushed opened the door to the bedroom and saw what she was doing. T.G. explained that [appellant] pulled up his pants once [M.M.] entered the room, however, this did not end the abuse. Once [M.M.] left, T.G. testified that [appellant] started all over again. [Appellant] pulled down his pants and her pants and inserted his penis in T.G.'s vagina, mouth, and anus. [M.M.] provided testimony corroborating T.G.'s description of the events on March 6, 2011.
>
> [M.M.] testified that he went over to [appellant's] residence on that day because he had gotten into a fight with his "old lady." At some point in the early afternoon, [M.M.] took a shower. [M.M.] testified that after the shower, he went back to [appellant's] bedroom to ask for a cigarette. He explained that the door was cracked open about an inch and a half, so "I swung the door open, and all I could get out of my mouth is, 'Can I get

- 2 -

a - ' and [appellant] had jumped, turned around with his penis sticking out of his pants, and his daughter wiping her mouth off."

*Birt* at ¶ 42-43.

{¶ 4} On March 7, 2011, hours after the incident between T.G. and appellant occurred, T.G. was examined at Cincinnati Children's Hospital by Dr. Stephen Warrick. In his physical examination of T.G., Dr. Warrick did not observe a tear or acute injury to T.G.'s hymen or an acute injury to her anus. However, he did observe erythema, or redness, on one side of her labia and a small abrasion, about one-half an inch long, on the other side.

{¶ 5} A rape kit was collected at the hospital by Elizabeth Stenger, a pediatric nurse sexual assault examiner. For the rape kit, among other things, vaginal swabs, rectal swabs, oral swabs, and dried-stain swabs from the left breast, right breast, and left side of the neck were collected from T.G.'s person. The rape kit, along with a buccal swab taken from appellant for a DNA reference standard, were sent to the Miami Valley Regional Crime Laboratory, where they were analyzed by Steven M. Wiechman, a forensic scientist. The vaginal swabs, rectal swabs, and oral swabs failed to indicate the presence of semen. Wiechman explained that the lack of semen was not inconsistent with a sexual assault as sometimes it simply is not left or, in some instances, he may not be able to find it.

{¶ 6} DNA testing was done on the vaginal swab and on the dried-stain swabs from the left breast, right breast, and left side of T.G.'s neck. There was no male DNA found on the vaginal swab. Wiechman used the vaginal swabs to obtain a DNA profile for T.G. The right breast swab was found to contain a DNA mixture of two people—T.G. and appellant. According to Wiechman, appellant was "the major contributor" of the DNA found on the swab. He testified that to a reasonable degree of scientific certainty the male DNA profile found on the swab was from appellant, explaining that "it far exceeded a thousand times the world's population which is almost 7 billion now," which meant he would have to test

that many people before he would find one person with a DNA profile similar to that found on the swab.

{¶ 7} As for the left breast swab, Wiechman testified that it contained a mixture of more than two contributors and appellant could not be excluded as one of the contributors. Wiechman explained, "comparing [appellant's] reference standard to this mixture, he has the possibility of being one of those contributors. That's not to say that he is in there, but he is possible, he is a possible contributor." He went on to state the following:

> And in making that determination, I have to put weight as to that match or that inclusion, and so with respect to that, I would say in the African-American population, it's one in 1.7 million Americans, African Americans. In the Caucasian population, it's one in 445, sorry, 445,800, and then in the southwest Hispanic population, it's one in 14,880,000. And so to kind of give you an explanation of those numbers, that means I would actually have to examine almost 1.7 million profiles before I would expect to see a possible contributor that would be in this possible mixture, and that's with respect to the African-American population.
>
> * * *
>
> With respect to the Caucasian population, it was 445,800 Caucasians. Basically, what that means is kind of the same thing with respect to the other populations is that I would have to test almost 450,000 people before I would expect to see another possible contributor into this mixture.

Additional DNA was present on the left breast swab that was not from either appellant or T.G.

{¶ 8} Finally, with respect to the swab of the left side of T.G.'s neck, Wiechman testified he obtained a "partial mixed DNA profile" that was consistent with being a mixture of two individuals and appellant could not be excluded as a possible contributor to that mixture. He explained, "with respect to the numbers on that particular profile, it was one in 1,489,000 in [the] African-American population, one in 1.682 million in the Caucasian population, and on the southwest Hispanic population, it was one in 13,640,000."

{¶ 9} On cross-examination, Wiechman was questioned about the ability for DNA to be transferred to an object or to another individual through touch or by a secondary transfer through an object, such as a towel. Wiechman testified that with respect to the DNA profile found on the right breast swab, "based on the amount that I found in there being that he [appellant] was the major [contributor] which means he made up the majority of this particular swab, I would say that it would be unlikely that it came from a secondary transfer."

{¶ 10} A jury ultimately convicted appellant of five counts of rape, one count of attempted rape, intimidation of a witness, and reckless operation. Prior to his sentencing, appellant filed a Motion for Leave to File a Motion for Acquittal and New Trial. The motion was denied by the trial court. Appellant then filed a Motion for New Trial Based on New Evidence, which was also denied by the trial court.

{¶ 11} Subsequently, on February 16, 2012, appellant was sentenced to an aggregate prison term of 43 years to life in prison. His conviction and 36-month sentence for intimidation of a witness was vacated for insufficient evidence on direct appeal. *Birt*, 2013-Ohio-1379 at ¶ 14-22. His remaining assignments of error challenging a supposed "duplicitous indictment and charges," the denial of a Crim.R. 29 motion for acquittal based on venue and the failure to establish specific dates for the rape offenses, the manifest weight of the evidence, the admission of certain evidence, and his sentence were overruled. *See Birt*.

{¶ 12} In October 2019, more than seven years after his convictions, appellant filed a petition for postconviction relief, raising claims of judicial bias, ineffective assistance of counsel, cruel and unusual punishment, and the alleged recantation of the victim's trial testimony. On February 19, 2020, the trial court dismissed appellant's untimely petition for postconviction relief, finding that appellant failed to demonstrate he had been unavoidably prevented from presenting his claims or that an outcome-determinative constitutional error

occurred at trial. Appellant did not timely appeal the trial court's decision, and on December 22, 2020, this court denied his motion for a delayed appeal. *State v. Birt*, 12th Dist. Butler No. CA2020-11-110 (Dec. 22, 2020) (Entry Denying Motion to File Delayed Appeal).

{¶ 13} On May 2, 2022, appellant filed an Application for DNA Testing, seeking to have the dried-stain swabs collected from T.G.'s left breast and left side of her neck retested and compared to M.M.'s DNA profile, which appellant indicated had been submitted to "CODIS" following M.M.'s felony arrest. Appellant argued that T.G. had recanted her trial testimony and identified M.M. as her sexual assailant and that DNA testing of the swabs collected from T.G.'s left breast and left side of the neck would show appellant's innocence of the crimes. Attached to his application for DNA testing was a notarized letter from T.G., dated December 18, 2017, a docket printout identifying M.M. as a defendant in a felony case, printed text messages, purportedly from T.G.'s phone, and a single page of his trial transcript.

{¶ 14} On May 24, 2022, the state filed a memorandum in opposition to appellant's application for DNA testing. The state argued that DNA testing was not permitted pursuant to R.C. 2953.74(B)(2) as further DNA testing would not be outcome determinative as it related to appellant. That is, appellant would not be excluded as a possible DNA contributor even if another individual—M.M.—was found to have contributed to the mixed DNA profile found on the left breast swab. The state further argued that the DNA from the rape kit was only "marginally relevant" as it related to only one count (Count 6) when appellant had been found guilty and incarcerated for an additional four counts of rape and one count of attempted rape. Attached to the state's memorandum in opposition were two Miami Valley Regional Crime Laboratory reports, one dated July 18, 2011 and the other August 19, 2011, which had been prepared by Wiechman following his analysis of T.G.'s rape kit.

{¶ 15} Appellant filed a reply brief in support of his application for DNA testing,

arguing that the DNA analysis was invalid as no "victim reference standard" had been used during Wiechman's testing. Appellant further argued that his DNA being found on swabs taken from T.G.'s person did not account for the biological relationship between himself and T.G. or account for the "physical altercation" that appellant claimed took place on March 6, 2011 between T.G., M.M., and himself.

{¶ 16} On November 15, 2022, more than six months after filing his application for DNA testing, appellant filed a "Motion to Supplement the Record Regarding Defendant's Motion for DNA Testing." Appellant sought to bolster his application by including a second letter from T.G., this one signed, but not notarized (dated November 15, 2015), and two recordings from T.G., recorded on April 17 and 21, 2019, wherein T.G. recanted her trial testimony about the sexual abuse and rapes.

{¶ 17} On December 2, 2022, the trial court issued a decision denying appellant's application for DNA testing, stating in relevant part the following:

> In this case, the defendant's DNA was found on the victim as it related to the charge in Count 6 of the indictment. As such, this is not a case where the defendant would ever be excluded as a possible DNA contributor. Further, even if additional DNA testing would provide a result establishing the presence of someone else's DNA other than that of the defendant, such result would not be outcome determinative. Rather, it would only establish that someone else had contact with the victim in this case.
>
> In reviewing the matter, the Court has reviewed the application, the supporting affidavits, the documentary evidence attached to the State's response as well as the files and records pertaining to the proceedings against the defendant. In doing so, the Court finds that prior DNA testing included the defendant and that any further DNA testing would not be outcome determinative. The defendant's application for DNA testing is hereby denied.

{¶ 18} Appellant appealed the denial of his application for DNA testing, raising two assignments of error for review.

{¶ 19} Assignment of Error No. 1:

- 7 -

{¶ 20} APPELLANT WAS DENIED DUE PROCESS OF LAW AND FUNDAMENTAL FAIRNESS UNDER THE OHIO AND U.S. CONSTITUTIONS AND THE TRIAL COURT ABUSED ITS DISCRETION WHEN THE TRIAL COURT DENIED HIS MOTION FOR DNA TESTING WHEN THE INITIAL TESTING WAS THE SUBJECT OF ERROR AND ADMITTED DEFICIENCY, FAILED TO PROVIDE DEFINITIVE AND DETERMINATIVE RESULTS, WAS NOT OUTCOME DETERMINATIVE TO GUILT, THE VICTIM/WITNESS RECANTED PRIOR TESTIMONY OF APPELLANT'S GUILT, AND THE VICTIM/WITNESS IDENTIFIED THE PERPETRATOR OF THE CRIME(S) AGAINST HER, WHO WAS NOT APPELLANT.

{¶ 21} In his first assignment of error, appellant argues the trial court erred in denying his application for DNA testing as the 2011 DNA testing was flawed and incomplete and, therefore, could not be considered "outcome determinative."  He further argues that T.G.'s recantation of appellant as the individual who sexually assaulted her and her identification of M.M. as the perpetrator demonstrate why additional DNA testing of the left breast swab and left side of the neck swab are necessary.

{¶ 22} Postconviction DNA testing for eligible inmates is addressed in R.C. 2953.71 through 2953.81.  Detailed grounds for accepting or rejecting applications can be found in R.C. 2953.74.  *State v. Curtis*, 12th Dist. Brown No. CA2014-10-019, 2015-Ohio-2460, ¶ 8.

{¶ 23} An appellate court reviews the trial court's decision regarding the acceptance or denial of an offender's application for postconviction DNA testing for an abuse of discretion.  *State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 111; *State v. Scott*, Slip Opinion No. 2022-Ohio-4277, ¶ 10.  "That discretion is to be exercised on a case-by-case basis, based on the unique facts of each case."  *Id.*  See also R.C. 2953.74(A) (trial court "has the discretion, on a case-by-case basis, to either accept or reject the application" for DNA testing).  "The term 'abuse of discretion' connotes more than an

error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "When applying the abuse-of-discretion standard, an appellate court may not merely substitute its judgment for that of the trial court." *Curtis* at ¶ 9.

{¶ 24} Appellant's application for DNA testing relates to materials that had already been tested during the trial stage of his case. Appellant's application is therefore subject to R.C. 2953.74(B)(2), which provides as follows:

> If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if * * *
>
> (2) The offender had a DNA test taken at the trial stage in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing regarding the same biological evidence that the offender seeks to have tested, the test was not a prior definitive DNA test that is subject to division (A) of this section, *and the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case as described in division (D) of this section would have been outcome determinative at the trial stage in that case.*

(Emphasis added.)[1]

{¶ 25} An "exclusion" or "exclusion result" means "a result of DNA testing that scientifically precludes or forecloses the subject offender as a contributor of biological material recovered from the crime scene or victim in question, in relation to the offense for which the offender is an eligible offender[.]" R.C. 2953.71(G). "Outcome determinative" means that

> had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to

---

1. An "eligible offender" is defined as "an offender who is eligible under division (C) of section 2953.72 of the Revised Code to request DNA testing to be conducted under sections 2953.71 to 2953.81 of the Revised Code." R.C. 2953.71(F). The state concedes appellant is an "eligible offender."

the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case as described in division (D) of section 2953.74 of the Revised Code, there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense[.]

R.C. 2953.71(L).

{¶ 26} In the present case, appellant's DNA was found on the victim as it related to Count 6 of the indictment, rape. Testing of the right breast swab was found, pursuant to a definitive DNA test, to be the DNA of appellant. "Definitive DNA test" means "a DNA test that clearly establishes that biological material from the perpetrator of the crime was recovered from the crime scene and also clearly establishes whether or not the biological material is that of the eligible offender." R.C. 2953.71(U).[2] As Wiechman explained at trial, appellant was the "major contributor" of the DNA found on the right breast swab and he would have to test a thousand times the world's population of almost 7 billion before another person with a DNA profile similar to that found on the swab could be found.

{¶ 27} In addition to definitively finding appellant's DNA on the right breast swab, appellant could not be excluded as a contributor to the DNA mixture found on the left breast swab or the swab of the left side of T.G.'s neck. Despite not being able to be excluded as a contributor, appellant wants new DNA testing done on the left breast swab and the swab collected from the left side of T.G.'s neck as he believes another individual, M.M., could be identified as a contributor to the DNA mixture. However, even if additional DNA testing established the presence of someone else's DNA other than that of appellant, such a result would not exclude appellant as a contributor to the biological evidence obtained from T.G.'s

---

2. Pursuant to R.C. 2953.71(U), "[a] prior DNA test is not definitive if the eligible offender proves by a preponderance of the evidence that because of advances in DNA technology there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover. Prior testing may have been a prior 'definitive DNA test' as to some biological evidence but may not have been a prior 'definitive DNA test' as to other biological evidence."

breasts and neck swabs. Rather, it would only establish that someone else had contact with T.G. As such, it would not be outcome determinative. *See State v. Sells*, 2d Dist. Montgomery No. 2016-CA-15, 2017-Ohio-987, ¶ 10 (upholding the denial of a postconviction application for DNA testing where, even if testing of the murder weapon and victim's pants had yielded a result establishing the presence of someone else's DNA, it would not have been outcome determinative, but rather would "establish only that someone else had touched the bat and had contact with the victim"); *State v. Blair*, 2d Dist. Clark No. 2017-CA-75, 2018-Ohio-4041, ¶ 16 (upholding the denial of a postconviction application for DNA testing where, "with a positive test of Blair's DNA, the best he could hope for from a subsequent more sensitive test of the same biological material would be a result showing that the car seat DNA was a mixture from Blair and someone else, but that would not be a 'DNA exclusion' and further would not have been 'outcome determinative'").

{¶ 28} The presence of another person's DNA on the swabs collected from T.G.'s person would not exonerate appellant of the rape charge contained in Count 6 or on the remaining four counts of rape and one count of attempted rape. *See State v. Madden*, 10th Dist. Franklin No. 08AP-172, 2008-Ohio-2653, ¶ 11 (upholding the denial of an application for postconviction DNA testing where "the allegation that appellant ejaculated on the carpet only concerned the incident that took place on August 22, 2001. Given the victim's testimony that appellant sexually abused her on multiple occasions over a roughly two-year period, an 'exclusion result' from the DNA testing requested by appellant would hardly be considered 'outcome determinative'"); *State v. Williamson*, 8th Dist. Cuyahoga No. 106480, 2018-Ohio-2226, ¶ 11-14 (upholding the denial of a postconviction application for DNA testing where the defendant was convicted of twelve counts of rape of the victim and the cup and flooring that the defendant wanted tested related only to a single incident, thereby demonstrating that "an 'exclusion result' from the DNA testing on these items * * * would not

be outcome determinative"). The inclusion of another individual as a possible contributor to a mixed DNA profile obtained from evidence collected from the March 6, 2011 incident has no bearing on the earlier rapes that occurred between 2005 and March 5, 2011.

{¶ 29} Appellant seeks to have the reliability of the 2011 DNA test results wholly discounted because of "flaws" he believes existed in the testing and analysis of the rape-kit swabs. Appellant first takes issue with the fact that the state did not submit a victim reference standard by means of a buccal swab to the Miami Valley Regional Crime Laboratory for comparison purposes. He further argues that Wiechman's analysis of the mixed DNA profiles found on all the swabs failed to account for the fact that T.G. was appellant's biological daughter who shared appellant's DNA and failed to "take into account the events" of March 6, 2011, wherein "[a]ppellant, [M.M.] and T.G. were all engaged in a physical altercation where contact or 'touch' DNA could be freely distributed among the participants." All of these supposed "flaws" appellant complains of were issues addressed in Wiechman's trial testimony and went to the weight of the DNA evidence, not to the reliability or admissibility of the evidence.[3] They do not change the fact that appellant cannot be excluded as a contributor to the mixed DNA profiles found on T.G.'s breasts and

---

3. As to the "victim reference standard," Wiechman explained that he obtained a DNA profile for T.G. from her vaginal swabs and used the vaginal swabs for comparison purposes in analyzing the mixed DNA profiles found on the breast and neck swabs. Wiechman also explained how "touch DNA" or "transfer DNA" occurred stating, "DNA transfer is perhaps like touch DNA from taking DNA form one person either to another person or to another object. So you're actually such as, you know, your hand, for example, if you're sweating and I touch this, that would be a primary transfer from one person to this object." He expounded on the possibility of touch DNA or transfer DNA being responsible for the mixed DNA profile found on T.G.'s right breast swab, stating, "based on the amount that I found in there being that he [appellant] was the major [contributor] which means he made up the majority of this particular swab, I would say that it would be unlikely that it came from a secondary transfer." Finally, with respect to the effect T.G.'s status as appellant's biological daughter had on his analysis of the mixed DNA profiles found on the dried-stain swabs, Wiechman explained the following:

> His biological children would have half [of his DNA], because they came from
> him, so half from mom, half from dad, so they would share half, but their
> profiles would still be different, and I could still make comparisons to say yes,
> this is this person; yes, this is this person, because they are different, but
> they do share half.

neck. In this case, additional DNA testing would not be outcome determinative. The trial court, therefore, did not abuse its discretion in denying appellant's postconviction application for DNA testing. Appellant's first assignment of error is overruled.

{¶ 30} Assignment of Error No. 2:

{¶ 31} APPELLANT WAS DENIED DUE PROCESS OF LAW AND THE TRIAL COURT ABUSED ITS DISCRETION WHEN THE TRIAL COURT FAILED TO DO ITS DUTY WHEN IT DID NOT CONSIDER OR ADDRESS ALL OF THE EVIDENCE PROVIDED FOR REVIEW OF THE ISSUES RELATED TO HIS MOTION FOR DNA TESTING, MAKING IT IMPOSSIBLE FOR THE TRIAL COURT TO PROVIDE A FULL AND FAIR RULING.

{¶ 32} In his second assignment of error, appellant argues the trial court erred in denying his application for DNA testing without considering or addressing all the evidence he submitted in support of his motion. Specifically, appellant contends the court erred by failing to address the evidence he submitted showing T.G. had recanted her trial testimony, including T.G.'s December 18, 2017 notarized letter, the text messages purportedly sent from T.G.'s phone, and the August 17 and 21, 2019 video recordings.

{¶ 33} R.C. 2953.73(D) provides that in determining whether an application for DNA testing should be accepted or rejected, the court "shall consider the application, the supporting affidavits, and the documentary evidence, and in addition to those materials, shall consider all the files and records pertaining to the proceedings against the applicant, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript and all responses to the application[.]" Following its determination, the trial court shall enter a judgment that accepts or rejects the application and "*includes within the judgment and order the reasons for the acceptance or rejection* as applied to the criteria and procedures set forth in sections

2953.71 to 2953.81 of the Revised Code."  (Emphasis added).  *Id.*

*Video Recordings*

{¶ 34} The video recordings appellant complains were not considered by the trial court were attached to his "Motion to Supplement the Record Regarding Defendant's Motion for DNA Testing," which was filed more than six months after his application for DNA testing was filed.  The trial court did not expressly rule on whether it was granting appellant's motion to supplement the record prior to issuing its decision denying appellant's application for DNA testing.  "'When a trial court fails to rule on a motion, an appellate court considers the motion denied.'"  *State v. Rarden*, 12th Dist. Butler No. CA2021-07-090, 2022-Ohio-873, ¶ 12, quoting *New Residential Mtge., L.L.C. v. Barnes*, 12th Dist. Warren No. CA2020-04-027, 2020-Ohio-6907, ¶ 16.  *See also In re F.B.*, 12th Dist. Brown No. CA2021-03-002, 2022-Ohio-499, ¶ 61 ("[w]here a court fails to mention or rule on a pending motion, we presume that the motion was implicitly overruled"); *Cleveland v. Barnes*, 8th Dist. Cuyahoga No. 111867, 2023-Ohio-1888, ¶ 23 ("it is well-settled that when a court fails to rule on a motion it will be presumed that the court * * * denied said motion").  As the trial court did not rule on the motion to supplement the record prior to denying appellant's application for DNA testing, it is presumed denied.  The video recordings, therefore, were not properly before the trial court and the court did not err in not specifically addressing the recordings.

{¶ 35} Appellant has not set forth an assignment of error challenging the denial of the motion to supplement, as required by App.R. 16(A).  As such, we need not address whether the trial court properly denied the motion to supplement.  *See* App.R. 12(A)(2).  We note, however, that the recordings were not submitted through an affidavit or otherwise authenticated, as required by Evid.R. 901 to be admissible.  They therefore would not have been proper evidence for consideration.  *See* R.C. 2953.74(D) ("If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code, the

court, in determining whether the 'outcome determinative' criterion described in divisions [B][1] and [B][2] of this section has been satisfied, shall consider all *available admissible evidence* related to the subject offender's case").  (Emphasis added.)

*Notarized Letter and Text Messages*

{¶ 36} As for the remaining evidence appellant complains the trial court failed to consider—T.G.'s December 18, 2017 notarized letter and the text messages—we find that the record reflects the trial court considered the evidence.[4]  Though the notarized letter and text messages were not individually addressed in the trial court's decision, the court noted in its denial of appellant's request for DNA testing that it had reviewed "the application, the supporting affidavits, the documentary evidence attached to the State's response as well as the files and records pertaining to the proceedings against the defendant."  As the notarized letter and text messages were discussed by appellant in his application and were appended to it, the trial court clearly reviewed and considered the evidence in ruling on his application for DNA testing.

{¶ 37} Though appellant argues the trial court should have specifically discussed T.G.'s recantation letter and text messages in its decision, the trial court was not required to do so.  R.C. 2953.73(D) only requires the trial court in accepting or rejecting an application for DNA testing to include "the reasons for the acceptance or rejection" of the application in its decision.  Here, the trial court did this, finding R.C. 2953.74(B)(1) was inapplicable and that the requirements of R.C. 2953.74(B)(2) had not been met.  With respect to R.C. 2953.74(B)(2), the court found that "this [was] not a case where the [appellant] would ever be excluded as a possible DNA contributor" since his DNA had been

---

4.  It is unnecessary to discuss whether the notarized letter or text messages were properly construed as "admissible evidence" under R.C. 2953.74(D), as the record reflects the court considered the letter and messages and, even with consideration of these items, appellant did not meet his burden for DNA testing under R.C. 2953.74(B)(2).

found on the victim with respect to Count 6 of the indictment. The court further addressed why further DNA testing of the breast and neck swabs would not be outcome determinative, stating that "even if additional DNA testing would provide a result establishing the presence of someone's DNA other than that of the [appellant], such result would not be outcome determinative. Rather, it would only establish that someone else had contact with the victim in this case." The trial court complied with the requirements of R.C. 2953.73(D) in issuing its decision, thereby permitting this court to conduct a meaningful review of its decision. Appellant's second assignment of error is, therefore, overruled.

{¶ 38} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.